CROUGHTON et al., Plaintiffs in Error, *v.* FORREST et al., Defendants in Error.

1. Partnership effects, transferred by one partner in fraud of his co-partners, will be held by third persons who receive them with information of the fraud, or without consideration, as trustees for the benefit of the firm.

*Error to Lewis Circuit Court.*

*Dryden, Pratt & Redd,* for plaintiffs in error.
*Green, Glover & Campbell,* for defendants in error.

RYLAND, Judge, delivered the opinion of the court.

This is a suit under the new practice, commenced in the Lewis Circuit Court, in February, 1850, by Robert Croughton and Edmund Harper, against the defendants, for the settlement of the accounts of the partnership of the firm of " Croughton, Coryell & Co.," composed of said Robert Croughton, Edmund Harper and John R. Coryell, and for a decree for certain partnership effects of said firm in the hands of the defendants, Amy Coryell and George W. Forrest.

The petition charges that the copartnership was formed in September, 1849 ; that Croughton furnished $2,800 cash capital, Edmund Harper $2,200, and the defendant, John R. Coryell, $260 ; that Harper, at the instance of his copartners, proceeded to Philadelphia, where he purchased for the firm a stock of goods, the prime cost of which was about $16,000— about $4000 of which was paid in cash, and the residue was on credit ; that the goods, on being brought to Missouri, were divided into two stocks—one stock, worth about $4,000, was delivered to Robert Croughton, to be opened and sold at Alexandria, in Clark county, Mo., and the remainder of the stock, worth about $12,000, was delivered to the defendant, John R. Coryell, to be opened and sold at Tully, Lewis county, Mo. ; that after the opening of the stock at Tully, and prior to the 8th of January, 1850, Coryell sold a large amount

for cash and on credit, and that on the last named day, there were accounts on the books of the firm against customers, amounting to about $2000, besides an account against Coryell for cash and merchandize withdrawn and used by him for his private purposes, amounting to about $2000 ; that Coryell, on the 8th of January, 1850, in the absence of his partners and without their knowledge or consent, with intent to defraud as well his partners, as the creditors of the firm, sold and delivered the whole remnant of the stock, worth about $8000, to one Ben. Harper, for the sum of $7,363 68, and in payment for the same, received :

1. A conveyance to him (Coryell) *in his own name*, from Ben. Harper, for lot 8, in block 1, in Tully, Mo., at the sum of - - - - -$3,775 00

2. The assignment to him, in his own name, of three notes for $75 each, on S. A. Bowen, at - - 225 00

3. Cash, - - - - - - - 1450 00

4. One note from Ben. Harper, payable to Coryell, in his own name, at one day after date, for - 550 00

5. One note from Ben. Harper to Coryell, (in C.'s own name likewise,) payable twelve months after date, for - - - - - - - 500 00

6. One note from Ben. Harper to Coryell, (in C.'s own name likewise,) payable one day after date, for 123 00

7. The discharge of an individual debt due from Coryell to Ben. Harper, amounting to - - - 309 00

8. The discharge of another individual debt of Coryell to Ben. Harper, amounting to - - - 56 46

9. The discharge of a debt from Mrs. Amy Coryell to Ben. Harper, amounting to - - - - 92 00

10. The discharge of a debt due to Ben. Harper from the firm, amounting to - - - - 102 00

11. One other note from Ben. Harper to Coryell, (in C.'s own name,) for - - - - 180 00

Total, - - - - - - $7,362 46

That Ben. Harper immediately paid Coryell $200 on the note for $550, which was credited thereon, and that some payments were made on the $180 note, by which it was reduced to $125, for which Ben. Harper gave a new note, and took in the original, and that Coryell immediately assigned the note for $123 to one Sutton, in satisfaction of a personal debt due from Coryell to Sutton; that in a few days after the sale of the goods to Ben. Harper, Coryell, in order to place the assets of the firm beyond the reach of his copartners and the creditors of the firm, and with intent to defraud the partners and creditors, assigned, transferred and delivered to the defendant, Forrest, the books of the firm and the accounts thereon, all of the said notes given by Ben. Harper, (except the one assigned to Sutton,) the three notes on Bowen, and also conveyed, by deed to said Forrest, the said lot 8, in block 1, in Tully, for the pretended price of $2,000—the same lot which said Coryell had a few days before taken from Ben. Harper at the sum of $3,775; that said Forrest accepted said conveyance and said assignments to assist Coryell in his said fraud; that, at the time of the sale of the goods from Coryell to Ben. Harper, Ben. held a deed from Jno. R. Coryell, which was in the nature of a mortgage, for lots 12 and 13, in block 1, and lot 3 in block 2, in Tully, to secure him, said Ben., in the payment of said debt of $309, due from said Jno. R. Coryell; that upon satisfaction of said debt out of the price of the goods, as above stated, Ben., at the instance of Jno. R. Coryell, and for no other consideration, conveyed said lots to Amy Coryell, in order to cover the same up from the creditors of said Jno. R. Coryell; that said Jno. R. Coryell held the bond of one Thompson for title to lot 3, in block 1, in Tully, which, immediately upon the sale of the goods, he fraudulently assigned and transferred to his mother, the said Amy, and that thus the whole of his estate, which could be reached by the process of the law, was transferred; that the other partners urged the defendant, Coryell, to place in the hands of a faithful receiver or trustee, the assets of the firm, in order that the debts might be paid, and that the

residue, if any, might be divided among the partners, all of which he at first refused; but it is admitted, he afterwards procured a re-conveyance of lot 8, in block 1, from Forrest, and a re-asssignment of the title bond for lot 3, in block 1, from his mother, and conveyed the same to a trustee, with power to sell for the benefit of the creditors, not, however, without first extorting from plaintiffs, Croughton and Harper, the agreement that, as among the partners, said lots should be considered as worth $6,500, when it was well known that they were not worth so much by $2000. It is also charged that the defendant, Forrest, refused to deliver up, or in any way secure to the plaintiffs the books, accounts and notes so assigned and transferred to him.

On the 22d of May, 1850, the defendants answered the petition severally.

John R. Coryell, by his answer, admits the main facts charged in the petition; admits he sold the goods to Ben. Harper, on the terms charged in the petition, without the knowledge or consent of his partners, but denies the fraudulent motive charged—offers, as an excuse for his conduct, that Edmund Harper had appropriated to himself a large amount of the capital stock, and was endeavoring to get possession of still more of the assets of the firm, intending, fraudulently, to convert the same to his use. He says, " the sale was made to Ben. Harper for the purpose of *securing our creditors from entire loss* on account of their just claims against us, and this mode of payment was adopted for two reasons; first, because in that way a larger price was obtained than I could have got in cash, and by taking the title in my own name, I intended to prevent the petitioner, Harper, from appropriating it, as he already had other sales of goods, to his own use, and to avoid the danger of liens of his individual creditors attaching." After detailing a long interview between Coryell and Ben., purporting to have occurred before the sale of the goods, in the course of which Ben. is made to express the opinion that Edmund, his brother, is a great knave, Coryell, says, "I found that his (Ben.'s)

predictions were being verified, and that he knew Edmund better than I did ; I therefore took his advice, and sold the stock of goods for the best price I could get, and in the manner, as *I then believed and still believe, most conducive to the interest of our creditors.*" He also admits the transfer of all the assets, and of his private estate, charged, to his co-defendants, Amy Coryell and George W. Forrest, but denies the motive imputed to him.

George W. Forrest expressly admits the transfer to him of the assets, charged in the petition to have been transferred to him by Coryell, except the note of $125, but admits he received a note for $79, corresponding in date, time of payment and parties, with the $125 note ; denies that his motive was fraudulent, and gives it as his opinion, " that the defendant, John R. Coryell, in his various transactions respecting said firm, was actuated by the *fair and honest* motive, so to use and employ the goods and effects of said firm, *as to pay the greatest amount of the indebtedness of said firm*, and release his personal liability in the greatest degree, brought on him by the plaintiff, Harper, by the purchase of said goods." He insists that he purchased the notes and accounts for a valid consideration, but does not state what the consideration was ; denies any *knowledge* of the fraudulent motives of Coryell, but does not deny his *information*, nor does he deny the *facts from which the fraudulent motive is inferred*. He attempts to justify Coryell's conduct, on the ground of the alleged bad faith of Edmund Harper. The material allegations in the petition, not expressly admitted by the answer, are admitted by omitting to deny them.

Amy Coryell does not deny the allegation that Ben. Harper held a deed from John R. Coryell, in the nature of a mortgage, on lots 12 and 13, in block 1, and lot 3, in block 2, in Tully, to secure a debt of $309, owing by John R. Coryell, and that said debt was paid out of the partnership effects, and that Ben., for that and no other consideration, at the instance of John R. Coryell, conveyed said lots to her, the said Amy ; but

says, that for the three lots bought of John R. Coryell, she paid him $400, and that she bought in good faith.

At the October term, 1850, the plaintiffs, by leave of court, filed an amended and supplemental petition, by which, Humphrey M. Woodyard, administrator of said Edmund Harper, (who, in the mean time, had died,) as well as the creditors of the firm of Croughton, Coryell & Co., are made plaintiffs. The defendants were summoned to answer the amended petition. Amy Coryell and George W. Forrest answered, but John R. Coryell did not.

On the trial of the cause, at the May term, 1852, before the judge, sitting as a jury, the plaintiffs introduced George Pattee, a witness, who testified : " I knew Dr. Coryell, defendant, in January, 1850 ; he was then selling goods in the town of Tully, for Croughton, Coryell & Co. ;" the firm, by common reputation, consisted of Robert Croughton, John R. Coryell, and Edmund Harper. I know that Ben. Harper purchased the stock of goods early in January, 1850. I was in the store of Croughton, Coryell & Co., when Coryell offered to sell me a note on Ben. Harper for $2000, payable in twelve months, secured by mortgage on the pork house, which, as I understood, he then had, or was to get for the goods. He asked me what I would give for the note on Harper, and also for a note on Payne & Boulware, for $1000, and one he expected to get on Daniel Liggon, for $500. I told him I would take them for twenty per cent. discount off the face of them ; he said he thought he could do better with Mr. Tate, but requested me to call the next day ; *the goods were then in the house.* He either said he had sold, or was about to sell them. I had previously, on the same day, been applied to by Ben. Harper, to lend him (Ben.) $800, to be used, as I understood, in the purchase of the goods. He said he had bought, or was about to buy, Coryell's goods. I told him he could have the money, if he would take, as cash, a note for $100, which I held on Coryell. When I went home in the evening, I sent for Mr. Forrest, the defendant, told him of the offer, and asked

him if he would join me, and go halves in the purchase. I think I told him all that occurred between myself and Coryell, in regard to the purchase. He agreed to join me. I told him I was going away from home the next morning, to be gone several days, and that he (Forrest) must attend to it; that he must not discount it at less than twenty per cent. Forrest said "no, we'll skin them if we can, and make something." I did not leave next morning, as I expected, but went to Tully to see Ben. Harper, and was in Tully till four or five o'clock in the afternoon. The goods changed hands, or were removed from the store of Croughton, Coryell & Co. to that of Harper, while I was there. Croughton was not there at the time the goods were removed; he had left that morning in company with Mr. Huner. In the conversation the evening before with Mr. Forrest, I told him to make the trade, but not to close it until my return. *I told him I was fearful there was something wrong.* I told him to see Mr. Woodyard, (a lawyer,) and see if the mortgage *on the pork house was right. I cautioned him a good deal to see if every thing was right.* I am rather easily frightened anyhow. I did not see Mr. Forrest again before I left. The firm of C., C. & Co. had commenced business tolerably late the preceding fall; they were selling at wholesale and retail, and, I thought, doing a good business. Forrest and Coryell were *intimate friends.* Forrest lived some four or five miles from Tully, and was there frequently—from one to three times a week—and Coryell frequently at Forrest's. Forrest was intimate with other men, and I have seen others there, as well as Coryell." On cross examination, witness said: "I don't know of my own knowledge whether Forrest bought the notes or not. The reason why I charged him not to close the contract until my return was, that I thought there might be some *swindling in regard to the goods*, but I do not recollect that I told Forrest this was my reason. I did not become a partner in the purchase of the notes. After my return, I had an interview with Mr. Forrest in regard to the purchase of the notes."

The counsel for the defendants then asked the witness to state what was said between him and Mr. Forrest, in regard to the purchase, to which question and to the answering of the same the plaintiffs objected. Their objection was overruled by the court, and they excepted. The witness then said : "When I came home, Forrest told me what he had done, and offered to let me into a share of the bargain. I refused, because he said he had taken the notes at ten per cent., and I was unwilling to have them at that rate ; they were not shaved deep enough."

The defendants then introduced Diedrich Huner, who testified : "I was a clerk in the store of C., C. & Co. up to the day the goods were sold and delivered to Ben. Harper. C. B. Tate consulted me, and told me he intended to make Coryell an offer for the goods. Coryell also consulted me, and told me that Tate had made him an offer for the goods, the amount of which offer I don't recollect, but think it was $4,500, a part of which was in cash-notes on persons whose names I do not recollect, and the amount of which notes I do not recollect ; and that said cash-notes were on persons who would pay on demand, and were considered good as cash. Coryell also told me, at the same time, that Harper had made an offer, but I don't recollect what the offer was. He and Coryell asked my advice as to which offer he had better accept. I advised him to accept Tate's offer : I said to him if he wished to pocket the money, Tate's offer was the best, if not, Harper's offer was best, for by that, he would get more for the goods." To the introduction of all this evidence, touching the propositions of Tate and Harper, and the conversations and consultations between witness and Tate, and witness and Coryell, the plaintiffs, by their counsel, objected, and their objection was overruled by the court, and the evidence given and the plaintiffs excepted. Witness then stated that Coryell had been talking to Tate and Harper, on the subject of a sale of the goods, for ten days before the sale to Harper ; that he did not know that any one, except Tate, Ben. Harper, Coryell and himself knew that Coryell contemplated a sale of the goods. Edmund Har-

per had gone to St. Louis, as he said, to purchase groceries to add to the stock, but the river had closed after he left. On the morning of the day the goods were transferred to Ben. Harper, I left Tully, in company with Dr. Croughton, for Monticello, distant about twelve miles. His business was to collect a debt at the latter place due to the firm. I said nothing to Croughton about the contemplated sale of the goods. On getting to Monticello, Croughton received a note from James A. Richardson, the sheriff, and friend of Croughton, informing him of the sale to Harper, and of the fact that he (Croughton) had hardly left the town before commencement was made in removing the goods. We went back, and the goods were then nearly all in the store of Ben. Harper. The invoice was made out at the store of Ben. Harper, after the removal of the goods. *The sale produced a considerable sensation in the community.* I have been engaged a number of years in the business of merchandizing, and do not recollect an instance in which goods were invoiced *after* they went into the possession of the vendee; it is usual to invoice them before they are delivered.''

Defendants then introduced evidence to prove that Edmund Harper, one of the partners, purchased all the goods in Philadelphia; that he had partnership funds for that purpose, amounting to $6000, and of that sum, he only paid out $2,618 57; that he afterwards took of the means of the firm, in goods and money, $2,435, for none of which any account ever was rendered either to the firm or the creditors; that Croughton, the other partner, had, at Alexandria, $4,037 worth of the goods, no part of which has ever been accounted for either to the firm or any of its creditors; that Coryell, the other partner, accounted for, in paying debts and expenses and losses of the firm, $1,088, and voluntarily conveyed to a trustee, for the use of the creditors of the firm, property at a nominal value of $4,500, together with the books of the firm, supposed to be worth $1000. This was all the evidence. The plaintiffs then asked the court to give the three following instructions:

HARVARD LAW SCHOOL LIBRARY

1. If it appear from the evidence that the notes, admitted by Forrest, in his answer, to have been received from John R. Coryell, were a part of the assets of the firm of Croughton, Coryell & Co., and that the same were transferred by Coryell to Forrest, with intent on the part of Coryell to defraud his partners or creditors, said transfer is void, and vests no title in Forrest in said assets, provided it shall further appear from the evidence that, at the time of said transfer, said Forrest had notice of the fraudulent design of Coryell, or had such information of the same, as would have put a man of ordinary prudence on enquiry.

2. If it appear from the evidence, that the said notes were transferred by Coryell to Forrest, with intent to hinder, delay or defraud the creditors of said Coryell, and that Forrest accepted the transfer, with notice of that intent, no title vested in Forrest, by reason of the transfer, as against the plaintiffs, and the court should find a verdict for the plaintiffs.

3. If it appear from the evidence that the lots 12 and 13, in block 1, and lot 3, in block 2, in Tully, were conveyed by Ben. Harper to Amy Coryell, and that the consideration for said conveyance was paid out of the assets of the firm of C., C. & Co., in that case, the said Amy is but the trustee of the said firm and of the creditors of the firm, and said property ought to be decreed to the plaintiffs.

The first two of which instructions were given, but the third was refused, and the plaintiffs excepted.

The court then found a verdict for the defendants, and dismissed plaintiffs' action.

1. From this statement of the case, it is clear that the court below committed error in finding for the defendants, and in dismissing this action. The answer of Coryell admits enough to authorize the court to decree against him. He admits the facts charged in the petition, but denies the fraudulent motive giving rise to the transaction. This is too flimsy an excuse to impose upon a court.

Here is the fact of a mercantile firm, formed in the fall of

1849—goods purchased and brought to this state, divided out among the partners, and sales made so as to create the belief that the firm was doing a good business. All at once, in January, 1850, one partner sells out the entire stock in his possession, without letting his partners know any thing about it, although one of them is, on the morning of the day the sale is made, in the village in which the business was carried on. So sudden was this sale, that it created a *considerable sensation in the community.* The partner thus selling, takes the notes payable to himself, receives the money, then sells the notes and accounts to the defendant, Forrest, and has conveyances of real estate made to his mother, the defendant, as part of the consideration of the goods thus sold. These goods are hurried with an unprecedented haste into the store or possession of the purchaser, and then afterwards an invoice is made of them. The facts also justify the belief that the defendant, Forrest, knew of the design of Coryell, before he purchased the notes and accounts.

The other defendant, Amy Coryell, should also be considered as standing in the attitude of a trustee, so far as regards the real estate, conveyed to her by Harper, in payment for the goods purchased by him of Coryell.

Why so suddenly cease to carry on this business, just begun a few months before — in the mean time, too, doing what was said to be a fair business ?

In looking into the answer, it seems that the defendant thought his partners were about to cheat and wrong their creditors in Philadelphia, and he would sell out and save them, as far as he could. The plaintiffs think that the defendant, Coryell, was determined to cheat their creditors at Philadelphia, and so they commenced this suit to prevent it. At all events, the creditors, who had furnished these men with the goods, were in a fair way to be defrauded out of their just debts. This whole transaction is full of fraud, if we are to believe the parties to this action. The courts, when such a case presents itself, should not hesitate a moment to declare it fraudulent,

and, by their action, remedy the evil as far as they have the power.

The judgment, in this case, of the court below, finding for the defendants, and dismissing the plaintiffs' action, is erroneous, and must be reversed; and such being the opinion of the other Judges, the same is reversed and remanded for further proceedings.